REGINALD P. D. HOLMES AND LEONARD W. COLBY, PLAINTIFFS AND APPELLANTS, V. EDWARD M. HILL, DEFENDANT AND APPELLEE.

Fraud: EVIDENCE. The evidence examined, and *Held*, To sustain the finding and decree of the district court, and not to present a case of fraud or undue influence.

APPEAL from the district court of Gage county. Tried below before BROADY, J.

*Lamb, Ricketts & Wilson,* for appellants, cited: 1 Story Jur., Sec. 238. 1 Perry on Trusts, Sec. 189. *Tracey v.*

*Sacket,* 1 Ohio State, 54.    *Griffith v. Godey,* 113 U. S., 89. *Moore v. Moore,* 56 Cal., 89.    *Dunn v. Chambers,* 4 Barb., 376.    *Todd v. Grove,* 33 Md., 188.

*Pemberton & Bush,* for appellee, cited: *Eyre v. Potter,* 15 How., 42.    *Korne v. Korne,* 3 S. E. Rep., 17.    *Uhlich v. Mulkhe,* 61 Ill., 499.    *Rochester v. Levering,* 104 Ind., 562.    *Collar v. Ford,* 45 Iowa, 331.    1 Parsons on Contracts, *388.    *Wright v. Fisher,* 32 N. W. R., 605.

COBB, J.

This is an action by Reginald P. D. Holmes and Leonard W. Colby, his guardian, plaintiffs, v. Edward M. Hill, defendant.    The principal object and purpose of the action was to annul, set aside, and avoid a certain contract entered into between Holmes and Hill on the 15th day of February, 1884, at Beatrice, in this state, which contract I copy from the brief of plaintiffs:

" This agreement made and entered into this 15th day of February, A.D. 1884, by and between Reginald P. D. Holmes, of Gage county, Nebraska, party of the first part, and E. M. Hill, of the same county, party of the second part, *witnesseth*; That the said party of the first part, in consideration of the covenants and agreements of the said party of the second part hereinafter contained, covenants and agrees to provide, furnish, and supply said party of the second part a sum of money, not less in amount than twenty-five thousand ($25,000) dollars, for the purpose of being handled, employed, invested, collected, reinvested, and used by said party of the second part in such manner and for such purposes as he may deem for the best interests of the parties hereto in accordance with this agreement, said money to be furnished to said second party by said first party for a term of seven (7) years from and after the first day of April, A.D. 1884; said party of the first part hereby agrees that said party of the second part shall have

the sole use, management, and control of said money and the property in which it may be invested for said period of seven years, to handle, use, invest, reinvest, collect, loan, buy lands or personal property, or otherwise use, employ, and dispose of it in such manner and for such purposes as said party of the second part may deem, judge, and consider to be for the best interests of the parties hereto; the intention of the party of the first part being to furnish and supply said money to said party of the second part to be handled, used, managed, controlled, and employed the same as if said money absolutely belonged to said party of the second part, except that it is to be used and employed for the benefit of both parties hereto, as herein set forth. Said party of the second part, in consideration of the foregoing agreement on the part of said party of the first part hereby agrees to take, receive, and accept the said sum of money, not less than twenty-five thousand dollars, from said party of the first part, and to use, manage, and employ it in such manner as shall, in his best judgment, produce the best income and largest profits obtainable from it; and to that end the said party of the second part agrees that he will use and employ said money only for such purposes as will, in his best judgment, produce a profit, and will only use and employ it in making such purchases, loans, and investments, and for such purposes as will, in his judgment, produce a profit on the money invested; and said party of the second part agrees that he will diligently and to the best of his knowledge, skill, and ability, use and employ said money and its proceeds in such manner and for such purposes only as he shall deem to be of benefit to both parties hereto; and that he will faithfully and correctly account to said party of the first part for the one-half of the profits arising from the use and employment of said money, and will pay the one-half of said profits to said party of the first part, at the times and in the manner herein set forth. The full amount of said sum of twenty-five

thousand dollars ($25,000) principal, and all the profits thereon, except such part of said profits as may be from time to time withdrawn by the parties hereto under this agreement, shall remain and be left in the hands of said party of the second part to be by him used and employed as herein stated, until the expiration of this agreement, at which time all the profits arising from the use and employment of said moneys, and not before that time divided, shall be equally divided between the parties hereto, share and share alike, and said party of the first part shall receive his said principal sum of twenty-five thousand dollars in full from said party of the second part, except such part of it, if any, as shall have been lost in the course of its use and employments by said party of the second part without any willful fault on his part— all said party of the second part agrees to do is to use his best judgment in the use and employment of said moneys, and it is agreed that he shall not be liable for any diminution of said principal sum arising from the errors of judgment in the use and employment of it. And it is agreed that neither party shall at any time withdraw from said business a sum of money exceeding the profits of said business for the preceding month, and that either party may, at the first of each month, withdraw from said business for his own use his share of the profits of said business during the preceding month, and no more. But neither party is at any time during the continuance of this agreement to withdraw any part whatever of said principal sum from its employment by said second party for the benefit of both parties in accordance with this agreement. In order that said party of the second part may use and employ said money for what is, in his judgment, for the best interest of both parties hereto, it is agreed that said party of the second part may purchase any kind of property he may see fit, either real or personal, or both, whenever in his judgment it will prove profitable to do so, and may sell,

exchange, or otherwise dispose of the same whenever he may deem it proper to do so, and may execute deeds, mortgages, or bills of sale of the same, whenever necessary, in the name of said party of the first part as his attorney in fact. And said party of the first part agrees to execute a power of attorney to said party of the second part for that purpose and for the purpose of carrying into effect this agreement, which shall be irrevocable during the existence of this agreement; and said party of the second part shall have the right to loan said money or any part of it to such persons, for such time and upon such security as he may deem best, and shall have power to collect and receipt for the same, and may use said money or any part of it for any other purpose or purposes, or in any other manner that he may deem proper for the purpose of producing a profit to the parties hereto; and said first party agrees that he will not in any manner interfere with the use and employment of said money or the property purchased with it, or any part of it, by second party, and will not make, or attempt to make, deeds, mortgages, or bills of sale to or upon said property, or on any part of it, during this contract, but will leave the use and employment, management, control, and disposition of it wholly and solely to said second party for the uses and purposes herein expressed.

" And for the true and faithful performance of all and every of the covenants and agreements above mentioned the parties hereto bind themselves, their heirs, executors, administrators, each unto the other, in the sum of one thousand dollars, to be paid by the failing party unto the other as liquidated damages.

"In witness whereof the parties hereto have hereunto set their hands the day and year first above written.

"REGINALD PLUMER D. HOLMES,
" E. M. HILL.

"In presence of
"L. M. PEMBERTON."

Also to vacate, annul, and set aside a certain deed of trust executed by the said Holmes and Nettie, his wife, to the said E. M. Hill, which I also here copy:

"*Know all men by these presents,* that I, Reginald P. D. Holmes, of Gage county, Nebraska, in consideration of the covenants and agreements hereinafter made, and one dollar to me in hand paid by E. M. Hill, of said county, do hereby bargain, sell, convey, and confirm unto the said E. M. Hill, all my property, both real and personal, situated and being in the state of Nebraska, in trust to and for the several uses, intents, and purposes hereinafter mentioned, to-wit: In trust to sell and convey, mortgage and release, incumber or otherwise dispose of said property, or any part thereof, to such person or persons, and in such manner and upon such terms as to him may seem best, and to secure and to receipt for, handle, use and employ, loan, invest, collect, reinvest, or otherwise use or dispose of said property, or any part thereof, in such way or manner and to such persons and upon such terms as he may deem best, and at the end of seven years from date hereof account, pay over to said Reginald P. D. Holmes, his executors, administrators, the principal amounts received by him from the property hereby conveyed, less any losses that may occur without the fault or negligence of said E. M. Hill, or his successors in trust, together with all the moneys and property that may be due to said Reginald P. D. Holmes by virtue of any agreement or contract that may then be existing by and between the said Reginald P. D. Holmes and E. M. Hill, or his successors in trust. In case of the death or disability of the said E. M. Hill to act as trustee, the said Reginald P. D. Holmes hereby covenants and agrees that George G. Hill and Henry M. Hill shall succeed E. M. Hill as trustee, with the same powers hereby conferred upon E. M. Hill, and in case of death or disability of either of the last named parties the other shall have full power and authority to execute the trust.

"And Nettie Holmes, wife of the said Reginald P. D. Holmes, hereby releases all her right, including her right of dower and homestead right in and to all the above described real estate.

"And the said E. M. Hill doth hereby signify his acceptance of this trust, and doth hereby covenant and agree to and with the said Reginald P. D. Holmes to discharge and execute the same according to the true intent and meaning of these presents.

"In witness whereof the parties hereunto set their hands this 23d day of February, A.D. 1885.

"REGINALD P. D. HOLMES,

"NETTIE HOLMES.

"W. D. HILL, witness."

And also to vacate, annul, and avoid a certain deed of conveyance, whereby the said Holmes conveyed to the said Hill, as trustee, certain real estate, in which the funds of Holmes had been invested, as follows, to-wit: W. $\frac{1}{2}$ N. E. $\frac{1}{4}$ and E. $\frac{1}{2}$ N. W. $\frac{1}{4}$ 10, 3, 4, Jefferson county, Neb., funds invested $2,582.18; also, N. E. $\frac{1}{4}$ 12, 1, 4, Jefferson county, funds invested $1,990.34; also, lots 5 and 6, block 78, Beatrice, funds invested $2,143.81; also, lots 11 and 12, block 9, Cortland, Gage county, funds invested $2,822.69.

There was an answer and a trial to the court, with findings and decree partly for the plaintiffs, and partly for the defendant. Both findings and decree are too lengthy to admit of their being set out here, but I will refer to their several parts as I proceed. Both parties excepted to such parts of the findings and decree as were unfavorable to their several and respective sides, and the plaintiffs bring the cause to this court by appeal.

The plaintiffs' ground and cause of action, as set out in their petition, consist mainly of the following propositions:

1. That the contracts are unfair as against Holmes, the considerations are inadequate on the part of Hill, so that

it would be inequitable, and against good conscience to allow him to retain their advantages as appear upon the face of the contracts.

2. That Holmes was induced to enter into the said contracts by means of undue influence and the abuse of fiduciary relations, which existed between the parties.

As a third proposition, subsidiary to the second; that Holmes is a person of weak, vacillating, and infirm mind and will.

Upon the first proposition the trial court did not directly find. Its first finding, and which was doubtless intended to cover this point, is, "that plaintiff Holmes is and has been of sound mind and memory, but a rank spendthrift, of much experience and travel on both sides of the Atlantic."

It may be stated as a proposition of general, if not of universal acceptation, that a person of full age, and "sound mind and memory," will be bound by his contract deliberately entered into upon a lawful consideration. And as there can be no doubt that the stipulations of the contract on the part of Hill furnished at least a lawful consideration for the contract on the part of Holmes, it was probably sufficient for the trial court to find that Holmes was possessed of a sound and unimpaired mind. The evidence upon which this finding is based is too voluminous to admit of even a resume of it here. It is a somewhat significant fact that while Holmes is represented in this litigation by a guardian, such guardian was not appointed for the reason of the mental decadence or imbecility of the ward, but that of his spendthrift habits and dissipation—habits which he acquired subsequent to the date of the first or principal contract.

If we look into the contract itself, we fail to find great evidence of either imbecility or incapacity on the one part, or of unusual craft and over-reaching on the other, but it is such a contract as a young man suddenly coming into the possession of a large sum of money, and fully aware of

his own financial incapacity and inexperience and proneness to yield to temptation, might be likely to make while under the best of influences for the protection and conservation of his fortune. While it is not necessary, in order to uphold the contract, that its terms should be found to be absolutely fair and equal, to each of the contracting parties, yet I think that, fairly interpreted and honestly and in good faith executed and carried out by both of the contracting parties, it afforded a safe and profitable investment for the funds of the plaintiff.

On the second proposition the trial court found, " that there was no undue influence to vitiate the papers made between the parties, Holmes, plaintiff, and Hill, defendant, in February, 1884. That the fiduciary relations between the said parties commenced on the receipt of the money by defendant in London, England, in April or May, 1884."

The evidence introduced on the part of the plaintiffs to sustain the charge of undue influence may be summarized as follows: Holmes was a young man, a native of England, but had resided in Germany with his mother for four or five years. He was about nineteen or twenty years of age, of good, fair education, but without a profession, and upon his first appearance at Beatrice was without means. He worked for different people at Beatrice, De Witt, and the country thereabouts, at driving stage, as a section hand on the railroad, and similar employment. While engaged in this employment, and after he had been in that neighborhood a year or more, he casually met and had an opportunity to show some trifling service to Mr. Hill, the defendant, who chanced to be at the place where he was working. Some time afterward, Holmes thinks in the latter part of the year 1881 or the forepart of 1882, Hill was again at the house where Holmes was employed, during his absence, and left word that he would like to have him come and work for him. The next day Holmes saw Hill. They had conversation, and Hill asked Holmes if

28

he would not like to work for him. He replied that he would, as he had nothing to do then, and he finally went to work for him writing in his books. He remained there three or four weeks at that time. During said time Holmes took his meals at Hill's house and " slept down at the office on the table." No rate of wages was agreed upon between them. Holmes states that he told Hill, " I thought I would do it for a mere nothing, just what he felt like paying me. He let me have a little money along. Sometimes he gave me a half a dollar if I asked him for it; some times a dollar, such amounts as that."

Holmes left Hill and went to peddling fruit trees; went to Hastings, to Grand Island, returned to Hastings, worked for a man there awhile; quit and returned to Grand Island. There joined a circus, and " went all over the country." That fall he left the circus at Birmingham, Alabama, and there engaged as a street car driver. He there received a letter from home informing him of the death of his mother. At the same time he received a postal card from Hill, to come to Beatrice immediately on important business. He immediately wrote to Hill saying that he " did not have any money, and for him to send me money, as I wished to see him any way." Hill sent a railroad ticket and money to Holmes, by means of which he finally returned to Beatrice, arriving there in November, 1884. Upon his arrival at Beatrice Holmes received from the hands of Hill a letter from London, reiterating the statement of his mother's death, and also informing him of the amount of money which she had left him. This letter had been addressed to Holmes in the care of M. E. Hill. After reading it, Holmes handed the letter to Hill and requested him to read it, which he did. Hill then took Holmes home with him to his house, after stopping and getting their dinner at a temporary eating house. Holmes continued to live at Hill's house, eating at the family table and sleeping with Mr. Hill's son, from the 23d day

of November until the 21st day of February, when Holmes and Hill left for London. Before leaving Beatrice they entered into and executed the first or principal contract.

Holmes, in his testimony given in his own behalf, states the conversation and narrates the circumstances which led up to the making of the arrangement by which Hill accompanied Holmes to London and acted as his attorney in settling up his deceased mother's estate. These circumstances and conversations are claimed by plaintiffs as undue influences exerted by Hill upon Holmes, whereby he was induced to enter into the contract. The marked difference in the bearing of Hill towards Holmes after his return from Birmingham, together with his assistance in enabling him to return, taking him into his house and family, and keeping him there until his return to London, and accompanying him thither, are pointed to as evidence of such influence. It is perhaps sufficient to say that the trial court appears not to have seen, nor do we, that evidence of fraud, unfairness, or design on the part of Hill in any of these transactions, nor of surprise, imbecility, or weakness on the part of Holmes, sufficient to avoid the contract between them, or which have characterized the cases where courts of equity have felt warranted in interposing between the strong and the weak.

Nearly all of the cases cited by counsel for the plaintiffs are where persons of advanced age, or whose minds have become enfeebled by sickness, have become the victims of designing relatives or persons upon whom they had a natural right to look for protection. An exception is furnished in the case of *Moore v. Moore*, 56 Cal., 89. In that case the plaintiff was the wife of one William H. Moore, with whom she lived and cohabited when he was killed by being shot. She was shown to have been in delicate health by the fact that she was delivered of a child within four months of the death of her husband. The sudden killing

of her husband caused her a great shock and prostration of mind and body, and unfitted her for the transaction of business.    On the second day after the burial of her deceased husband, and before she had recovered from the shock which his death had occasioned, she was waited upon by two brothers and two brothers-in-law of her late husband, who were accompanied by an attorney and notary. They presented to her, and requested her to sign, the instruments which the action was afterwards brought to avoid.    She was told by one of the brothers of her late husband that it was his wish that she should sign them, and thereupon without reading or knowing the contents of them, and without any negotiation as to the price to be paid, or any agreement or understanding in relation to any consideration for her doing so, she signed three instruments by which she transferred to the surviving children of her late husband her entire interest in his estate.    The estate transferred was of the value of $47,000.    The court over-ruled a demurrer to the petition setting out the above facts, stating the salient facts of the case to be, "That the transfer was made without negotiation, explanation, or any conceivable adequate motive.    The time selected for the transaction, in view of her then recent bereavement, and the shock which such an event would naturally inflict upon her, was at least malapropos.    She alleged that she was suffering at the time from the effects of the shock which she had sustained by her late husband's death.    She also alleges that she did not read and was not informed of the contents of the instruments which she signed."

In the above case the court went farther than in any other to which my attention has been directed, but it falls far short of that which is contended for here.

I come to the conclusion that neither on account of inherent unfairness or inequality in the terms of the contract itself, of mental imbecility, immaturity, or unsoundness on the part of Holmes, nor of undue influence by reason of the

personal relations of the parties, is the first or principal contract successfully attacked, and the opinion and decree of the district court in upholding the same must be affirmed.

The findings and decree of the district court upon the remaining and minor questions involved in the case are mainly in favor of the plaintiffs, and as the defendant did not perfect his appeal, they will not be examined.

The court, however, found and decreed in favor of the validity of the deed of trust executed by Holmes and wife to Hill, trustee, under date of February 23, 1885, in so far as the same is in furtherance of the original contract, but not in so far as the same sought to create other and additional trustees in case of the death of E. M. Hill, trustee. In this I think there was no error.

The decree of the district court is affirmed.

DECREE AFFIRMED.

THE other judges concur.